IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| SARAH DILLARD,<br><br>       *Plaintiff,*<br><br>  v.<br><br>INTERNACIONAL REALTY MANAGEMENT, LLC AND L. MIGUEL ARCE,<br><br>       *Defendants.* | Case No.: 1:22-cv-1215 |

### COMPLAINT

Plaintiff Sarah Dillard, by and through her attorneys, for her Complaint against Defendants Internacional Realty Management ("INT" or the "Company") and L. Miguel Arce, states as follows:

### NATURE OF THE ACTION

1. This action seeks to remedy years of discrimination and hostile work environment perpetuated by INT and its CEO L. Miguel Arce against Plaintiff Sarah Dillard because of her sex. Miguel was CEO, majority owner, and the ultimate decision maker and cultural emissary within INT, and through his acts, influence and example, he created a sexually charged workplace where sexual discrimination was not only tolerated, but condoned and perpetrated by INT upper management for years.

2. Miguel initiated and then later through his threats and intimidation forced a years-long sexual relationship with Ms. Dillard, who was his subordinate within the Company, and punished her when she ultimately ended the relationship by depriving her of compensation that

1

she had already earned, treating her disparately than her male colleagues, and ultimately terminating her employment.

3. Outside of the employment relationship, Miguel stalked Ms. Dillard through phone calls, text messages, and emails at all hours of the day, lying in wait for Ms. Dillard at her residence, following and stalking her on the highway, and subjecting her to violent outbursts of rage designed to intimidate and manipulate Ms. Dillard into staying in a sexual relationship with him and cause her extreme distress.

4. This is an action to enforce the provisions of Title VII of the Civil Rights Act of 1964 (42 U.S.C. . § 2000e et seq.), the Texas Commission on Human Rights Act, and Texas state common law against the Company and L. Miguel Arce for their wrongful and unlawful conduct.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 as this case arises under the laws of the United States, namely Title VII of the Civil Rights Act of 1964, as amended.

6. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

7. Venue is proper in this district under 28 U.S.C. § 1391 because the events and omissions giving rise to the claims alleged in this complaint partly took place in this District.

## THE PARTIES

8. Sarah Dillard is a real estate professional who has worked in commercial real estate for more than 20 years. Ms. Dillard started in the business as a leasing agent at multi-family residential properties at age 19. Because of her grassroots experience on the operations side of the business, managing operations for multi-family residential properties is her specialty.

9. After working her way up in the industry, Ms. Dillard spent the majority of her 20-year career at INT until she was "fired" effective October 1, 2021 while serving as President of the Company. As explained further below, Ms. Dillard's termination was pre-textual, and in reality she was discharged because she ended a sexual relationship with INT CEO L. Miguel Arce.

10. Ms. Dillard resides in Austin, Texas.

11. Defendant INT is a limited liability corporation organized under the laws of the State of Texas. INT maintains an office in this District, in Austin, Texas.

12. INT is in the business of acquiring, managing, and selling commercial real estate, such as multi-family residential properties. INT buys multi-family residential properties (apartment complexes) then manages and improves their operations (Ms. Dillard's specialty) with the goal of selling the asset for a profit. INT also manages multi-family residential properties owned by other companies who do not have their own in-house property management Company.

13. Defendant L. Miguel Arce is the current CEO and controlling shareholder of INT, along with his mother and step-father Irma and Hugh Carraway, who currently own a 20-percent stake in INT. In INT's beginning, Irma and Hugh owed the majority stake in the company.

14. Miguel was handed his title and company responsibilities from Irma and Hugh. He started out with an equal interest as his half-sister Carla Laws, who he ultimately forced out of the company.

15. Miguel had no commercial real estate business before he was handed his title and position, and had no experience in multi-family real estate operations like Ms. Dillard did. Miguel's background was in hotel hospitality sales before joining INT.

16. On information and belief, L. Miguel Arce also resides in Austin, Texas.

**CONDITIONS PRECEDENT**

17.     On January 24, 2022, Ms. Dillard timely filed a Charge of Discrimination against INT with the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission. On or about August 19, 2022, Ms. Dillard received a Notice of Dismissal and Right to File Civil Action. (Right to Sue Letter, attached as **Exhibit A**.) This action was filed within 90 days of Ms. Dillard's receipt of the Notice of Dismissal and Right to File Civil Action.

**FACTUAL ALLEGATIONS**

**Ms. Dillard's Experience in Commercial Real Estate**

18.     Ms. Dillard began working for INT as an Assistant Manager in March 1998, and was quickly promoted to Property Manager. She was again promoted in September 1999 to Regional Supervisor.

19.     After a short hiatus away from the Company to work for another commercial real estate firm, Ms. Dillard, at Miguel and Irma's behest, returned to INT in October 2009 as a Regional Supervisor where she continued to excel and exceed expectations.

20.     As a result of her consistent high performance and work ethic, Ms. Dillard was promoted to President of INT in March 2011.  She continued to perform well in her role as President without issue until she was abruptly fired effective October 1, 2021.

21.     In the industry, employees like Ms. Dillard play a key role in acquiring, managing, and selling commercial assets.  Her expertise is property management, and as part of that role, she is tasked with improving the tenant base, occupancy, and running each multi-family property. Due to Ms. Dillard's efforts, multi-family properties that are purchased by INT and ultimately sold, are worth more (often considerably more) than when the property was originally acquired by INT.

22. In addition to a salary, key employees like Ms. Dillard are compensated through two types of commissions: a commission paid when a particular asset is purchased (the "Acquisition Fee") and a commission paid when that asset is ultimately sold (the "Promote").

**The INT Work Environment**

23. When Ms. Dillard first started with INT, Irma and Hugh were in charge of the business. Hugh was the Chief Executive Officer and Chief Financial Officer, and Irma concentrated on day-to-day operations, running the property management company. At that time, Miguel was on the acquisitions and development side of the business.

24. In or about 2015, Miguel began a plan to force his half-sister, Carla Laws, from Company ownership and a role in management. At that time, Ms. Laws was serving as INT's Chief Operating Officer.

25. Miguel hatched a plan to force his half-sister out of the Company and did so by mistreating Ms. Laws in front of other employees and taking other steps to make the work environment uncomfortable and intolerable for Ms. Laws. Eventually, in 2016, Ms. Laws was forced out altogether, and Miguel purchased all of her 40 percent ownership in INT. After that purchase, Miguel became 80 percent owner in the company, and Irma and Hugh's interest in INT, through trust, dropped to 20 percent.

26. After Miguel forced Ms. Laws out of the business, the atmosphere at INT became a sexually charged one, a tone that was set as Miguel moved into a position of power at the Company. With Ms. Laws no longer present to rein in Miguel, the atmosphere continued to deteriorate from that point forward. For example, under Miguel's reign at the Company, upon information and belief, it was customary for male supervisors to flirt with and touch inappropriately their female subordinates and female vendor representatives.

27. Upon information and belief, this type of behavior was condoned by the other owners (Hugh and Irma) and other male managers and supervisors who treated women similarly.

28. During that same time frame and continuing up to Ms. Dillard's termination, Miguel wanted work to be "fun" and less stuffy, and Miguel began partying with female subordinates after "leadership conferences" and other Company functions. It was not uncommon for Miguel to become stumbling drunk during Company-sponsored outings, and that behavior continued throughout Ms. Dillard's tenure with the Company.

29. What started as binge drinking after corporate events progressed to strip clubs, where Miguel and other male executives would invite female employees to party after official work functions. At these events, alcohol was always consumed in excess, and there was pressure to do so. If an employee was drinking too slowly at an event, Miguel would ask that employee, "do you want a nipple with that." If an employee declined additional alcoholic beverages, Miguel would order one for them anyway. Expenses for these sexually inappropriate drinking and strip-club binders were reimbursed by INT.

30. Upon information and belief, it was customary for male INT executives to talk about their female colleagues to other male employees in sexually explicit and objectifying terms, in classic "locker-room" style behavior. For example, behind their backs, male colleagues could be heard disparaging or making off-color jokes about their female colleagues, calling them names or labeling them "toxic."

31. In addition to orchestrating and continuing this conduct, Miguel behaved erratically, and sometimes violently, as well.

32. During the time frame of the events described herein, Miguel was abusing controlled substances, including alcohol and Adderall, which caused him to act irrationally and

6

erratically. In one such violent outburst, for example, fueled by anger over Ms. Dillard's attempts to maintain a professionally distant relationship, he went into his office and in front of Ms. Dillard and other colleagues, swept all of the liquor bottles off his desk, creating a whirlwind of broken glass and spilled liquor, which others were expected to clean up.

33. Other times, Miguel yelled and screamed at female employees in front of others, subjecting them to embarrassment and humiliation.

**Compensation for Females Differed From Similarly Situated Males**

34. In addition to being subjected to this treatment by Miguel and other male executives within the Company, female employees were routinely paid differently and less than their similarly situated male colleagues.

35. INT's compensation arrangements with Ms. Dillard's male colleagues made clear that the two distinct commissions that were paid at separate times (at the close of the acquisition and then close of the sale of the property) were "earned" and payable to male employees regardless of their employment status at the time payment was to be made. In other words, INT recognized that for its male employees, they had earned 100 percent of both the Acquisition and the Promote fees at the time when an asset was purchased, even though those commissions were paid at different times, sometimes years apart, and sometimes after those male employees were no longer employed by the Company.

36. For Ms. Dillard's acquisition and promote compensation, however, Miguel designed her compensation in such a way that she had to "be present to win" as set forth in a "Compensation Memo" authored by Miguel. Thus, as dictated by Miguel, Ms. Dillard had to be employed by INT on the day an asset was ultimately sold to be entitled to the entire Promote commission payment that her male colleagues had already "earned."

37. This was true even though all the efforts for improving this asset had already been expended. And this was so despite the fact that as President and the operations specialist, Ms. Dillard played an integral role in acquiring, managing and improving the assets, and selling them for profit, in contrast to the male employees who, despite being her subordinates, were not subject to this "present to win" condition.

38. Thus, her male colleagues earned and were entitled to receive 100 percent of their share of the incentive compensation regardless of their employment status at the time payment was to be made, whereas Ms. Dillard "must be present to win" otherwise she forfeited all but 25 percent of the compensation that she, like her male colleagues, had already earned.

39. That condition (that she had to be employed by the Company to receive the Promote commission) made Ms. Dillard's continued employment a point of leverage that Miguel had over her and that he did not have over other similarly situated male employees of the Company, who had the freedom to leave INT—or be fired from INT—and still receive their earned commissions.

40. This incentivized Ms. Dillard to stay at INT, no matter how difficult or untenable the work environment became so that she could receive her full, earned compensation.

41. In addition, when new executive employees were added to the roster of employees, the existing employees were required to give up some percentage of their own allocations to the new employee so that everyone entitled would receive a piece of the Promote or Acquisition pie.

42. When it came time to giving up percentage shares, those were taken from male and female executives alike under the compensation program.

43. When one of those colleagues left, however, leaving the percentage of that departed executive's allocations for future acquisitions on the table, as explained further below, the departed

employee's share was returned only to the male executives and not the female executives who had originally lost shares to the new share partner.

44. Thus, with each departure, the female executives share was diminished, but never returned to that female executive, reducing overall the amount of compensation paid to female executives versus the male executives.

**Miguel Makes Sexual Advances Towards Dillard**

45. In December 2016, after heavy flirting, Miguel began making sexual advances toward Ms. Dillard at the INT Christmas party. Initially, she resisted his advances, but over time, as they continued and increased in frequency, eventually she went along with them.

46. Ultimately, under constant pressure from Miguel, he and Ms. Dillard began a sexual relationship in or about early 2018, even though Miguel was married at the time. There was a tangible power imbalance between Miguel and Ms. Dillard throughout their relationship.

47. In late 2018, Ms. Dillard attempted to end the sexual relationship with Miguel for the first time, but Miguel refused to allow her to do so, instead promising her a five percent ownership interest in the Company.

48. Although the paperwork finalizing the gift of the five percent ownership interest was drawn up and Hugh and Irma had agreed to the gift, Miguel refused to finalize the deal, despite Ms. Dillard's constant reminders and requests that he do so.

49. Miguel used Ms. Dillard's ownership interests as a continuous "carrot" to keep Ms. Dillard in the sexual relationship, and threatened her with the "stick" of termination if she did not comply. As the relationship continued, Ms. Dillard did not believe that she could refuse Miguel's sexual advances without subjecting herself to an adverse employment decision. Effectively, Ms. Dillard believed she could not say no to Miguel, although she wanted to do so. Ultimately, Miguel

never finalized the paperwork for her five percent interest, choosing instead to fire Ms. Dillard, as explained further below.

50. During the months that followed, when Ms. Dillard continued to try to distance herself from the sexual relationship, and each time that she did so, Miguel engaged in irrational, hostile, and disturbing behavior, ranging from his refusal to end the relationship to having what witnesses will describe as a meltdown at the office. When Ms. Dillard would try to pull away, Miguel would constantly text, email, and phone her at all hours of the day and night in attempt to "win" her back.

51. During this same time frame, Miguel forced Ms. Dillard to delete their personal emails, denied her lawful request for time off so that she could take a break from the hostile and increasingly uncomfortable work environment as Ms. Dillard tried repeatedly to end the relationship, and held for unreasonable periods of time Ms. Dillard's expense report, depriving her of money that was owed to her.

52. After Ms. Dillard finally succeeded in ending the relationship, in or about May 2020, Miguel would still flirt occasionally at work but the two were able to work together in a reasonably amicable environment for a couple months, until Ms. Dillard began dating again. When Miguel learned that Ms. Dillard was dating other men, his behavior changed back to the erratic, irrational, and intimidating character that had been several months before.

53. In or about November 2020, at or around the same time that Miguel learned that Ms. Dillard was dating, he refused to let her leave a ride share after a work function and touched her inappropriately on her backside.

54. Throughout the relationship and continuing during this time frame, Miguel would show up on foot, bike, or by car at her apartment complex looking for Ms. Dillard, without an

invitation from her to visit. At times, Miguel would insist that Ms. Dillard let him into her apartment and once there, acted in threatening, rough, and violent ways.

55.     In or about November 2020, Miguel escalated that troubling behavior by following Ms. Dillard for miles on the highway.

56.     Ms. Dillard was fearful and concerned for her safety as the result of Miguel's conduct. As a result of Miguel's conduct, she suffered from anxiety, insomnia, and other health issues.

57.     Thereafter, with the departure of a male executive entitled to share in the future Promote and Acquisition compensation schedule, the shares that Ms. Dillard and others had given up in favor of that colleague were reallocated, but disparately so. Instead of returning the shares to their status quo, Miguel reallocated the percentage of that male colleague's percentages of future Promotes to the other male executives only. In other words, the percentage share of profits that Ms. Dillard and her female colleague had given up were returned to the male colleagues only, thereby further enriching male executives to the detriment of the female executives.

58.     Thus, Ms. Dillard's willingness to participate in a sexual relationship with Miguel had become the "quid pro quo" for their relationship. As long as she participated and went along with Miguel's demands, she was employed and was paid in the same way as the similarly situated male employees. When she was no longer willing to participate, her compensation was diluted, and as explained below, Miguel fired her, thus cutting off payment of 100 percent of her already-earned compensation.

**Dillard's Pretextual Termination**

59.     In spite of the hostile work environment and Miguel's frightening behavior, Ms. Dillard continued to excel in her role as President, even after she broke things off with Miguel in or about May 2020.

60. Indeed, Hugh and Irma wrote that they were proud of the job Ms. Dillard was doing leading the Company, and Miguel himself wrote that she was "the best president for this company."

61. As noted above, Miguel and Hugh and Irma gifted Ms. Dillard a five percent interest in INT, which Miguel refused to finalize, despite Ms. Dillard's multiple requests that he do so.

62. After Ms. Dillard ended the relationship, Miguel continued to flirt and try to woo her back. When his charms were refused and Miguel knew that she had moved on for good, he began a plan to get rid of Ms. Dillard.

63. In 2021, Miguel began to undermine Ms. Dillard among her colleagues and belittle performance concerns she raised about others. In July 2021, for example, Ms. Dillard raised concerns about the chain of command to Miguel, which was an issue that she had previously raised with him and who had previously agreed there were concerns.

64. In contrast to his previous stance on the subject and since the end of the sexual relationship, Miguel lashed out at her, blaming Ms. Dillard instead, and stating, "Please do not treat anyone in this organization like that ever again or we will be going our separate ways for certain. *If the relationship is terminated in a positive manner then I will work with you on those future promotes,*" acknowledging that he was using her employment status and her disparate compensation to force her compliance with his demands.

65. Miguel continued to reverse course on other management issues on which he had previously been in agreement with the way Ms. Dillard had been handling the matters, and he went behind her back to reassign her responsibilities when she was on vacation with her new significant

other. When Ms. Dillard sought to discuss the change of course, Miguel lashed out at her and blamed her for misunderstandings and other concocted issues that had never before been raised.

66. Ultimately, after gas lighting Ms. Dillard and other employees about her performance, Miguel announced in or about September 2021 that the position of "President" was being eliminated, and that he was terminating her employment.

67. Ms. Dillard's last day was on September 30, 2021.

68. In reality, however, the position was not eliminated, and that was a pretext. On information and belief, another INT employee now is employed as its "President."

## COUNT I
### Title VII of the Civil Rights Act of 1964
### Against INT
### (42 U.S.C. § 2000e et seq.)

69. Ms. Dillard repeats and realleges the foregoing paragraphs as though fully set forth herein.

70. As a female employee of INT, Ms. Dillard is a member of a class protected under Title VII.

71. INT, through its CEO L. Miguel Arce, subjected Ms. Dillard to unwelcome sexual advances and harassment because of her sex, and as described above, sex became the quid pro quo for her continued employment and compensation at the full amount as her similarly situated male colleagues. Miguel also subjected her to a hostile work environment.

72. INT, through Miguel and others, knew or should have known of the harassment and failed to take prompt remedial action.

73. As a direct result of the acts and omissions described above, INT and Miguel Arce have violated, and are continuing to violate Title VII, and have caused and are causing injury to Ms. Dillard, by intentionally discriminating against her based on sex.

## COUNT II
### Sex Discrimination under the Texas Commission on Human Rights Act (TCHRA), Texas Labor Code § 21.0015
### Against INT

74. Ms. Dillard repeats and realleges the foregoing paragraphs as though fully set forth herein.

75. INT, through its CEO L. Miguel Arce, subjected Ms. Dillard to discrimination based on her sex as described more fully above.

76. INT, through Miguel and others, knew or should have known of the harassment and failed to take prompt remedial action.

77. When Ms. Dillard ended the relationship, INT, through Miguel, fired her. Although INT may claim that the termination was for performance reasons, that was a mere pretext for discrimination, and discrimination was a motivating factor for Ms. Dillard's termination.

78. As a direct result of the acts and omissions described above, INT has caused and is causing injury to Ms. Dillard, by intentionally discriminating against her based on sex.

## COUNT III
### Assault and Battery – Texas Common Law
### Against L. Miguel Arce

79. Ms. Dillard repeats and realleges the foregoing paragraphs as though fully set forth herein.

80. By 2019, Miguel Arce's sexual advancements were offensive and provocative to Ms. Dillard. On multiple occasions, after Ms. Dillard had tried to end the sexual relationship, Miguel acted in a threatening and intimidating way towards her, including without limitation,

14

directing violent outbursts towards her outside of work, following her on the highway, stalking her in her apartment complex, constant telephone calls and texts at all hours of the day and night, and refusing to let her end the relationship.

81. Because of the unbalanced power positions, Ms. Dillard was not in a position to defend against Miguel's unwanted and threatening conduct and sexual advances because doing so would (and did) result in an adverse employment action against her.

82. As a result of Miguel Arce's actions, Ms. Dillard has been injured.

## COUNT IV
### Intentional Infliction of Emotion Distress – Texas Common Law
### Against Miguel Arce

83. Ms. Dillard repeats and realleges the foregoing paragraphs as though fully set forth herein.

84. Outside of the employment relationship, Miguel stalked, intimidated, and harassed Ms. Dillard at all hours of the day and night. Miguel's actions were intentional or, at a minimum, reckless, and were calculated to manipulate and induce fear in Ms. Dillard. Miguel intended to act in a way to cause Ms. Dillard distress.

85. Miguel's acts were beyond the bounds of what society views as normal and could be considered stalking.

86. Miguel's actions caused Ms. Dillard extreme trauma, grief, anxiety, shame, humiliation, embarrassment, anger, disappointment, worry, and nausea, and these effects were severe.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sarah Dillard prays for the following relief:

A. Enter judgment in her favor and against Defendants Internacional Realty Management, LLC and L. Miguel Arce;

B. An award to Ms. Dillard of complete make-whole relief, including constructive seniority for all purposes, back pay with prejudgment interest, front pay, fringe benefits, tax-effect awards, and compensatory damages;

C. An order or judgment permanently enjoining Internacional Realty Management, LLC, L. Miguel Arce, and its other officers, agents, employees, and all others performing in active concert or participation with them from mistreating, exploiting, or otherwise discriminating against female employees because of their sex;

D. Reasonable attorneys' fees, expert fees, and the costs and expenses of this litigation;

E. Punitive damages; and

F. Such other and further relief as the Court deems just and appropriate.

## JURY DEMAND

Plaintiff Sarah Dillard, demands trial by a jury on all issues for which a jury trial is allowed.

Respectfully submitted,

By:_____
John R. Nelson
State Bar No. 00797144
Kristen E. Hudson
State Bar No. 24120442
Andrew J. Alvarado
State Bar No. 24118811
DICKINSON WRIGHT PLLC
607 W. 3rd Street, Suite 2500
Austin, Texas 78701
Telephone: 512-770-4200
Fax: 844-670-6009
jnelson@dickinson-wright.com
khudson@dickinson-wright.com
aalvarado@dickinson-wright.com

**ATTORNEYS FOR PLAINTIFF**